A10A0362. HYPERDYNAMICS CORPORATION v. SOUTHRIDGE CAPITAL MANAGEMENT, LLC et al.

(699 SE2d 456)

BERNES, Judge.

This case explores the breadth of Georgia's Long Arm Statute. Appellant Hyperdynamics Corporation filed the instant lawsuit against various resident and nonresident corporate defendants, alleging that they had fraudulently induced Hyperdynamics to engage in a predatory financing scheme causing it injury. The trial court dismissed the action as to the nonresident defendants after concluding that they fell outside of the reach of the trial court's personal jurisdiction. Hyperdynamics appeals, arguing that the trial court misconstrued Georgia's Long Arm Statute. Because we conclude that jurisdiction in Georgia is proper over the nonresidents under the theory of conspiracy jurisdiction, we reverse.

*I. Burden of Proof and Standard of Review*

A defendant moving to dismiss for lack of personal jurisdiction bears the burden of proving the absence of

jurisdiction. To meet that burden, the defendant may raise matters not contained in the pleadings. However, when the outcome of the motion depends on unstipulated facts, it must be accompanied by supporting affidavits or citations to evidentiary material in the record. Further, to the extent that defendant's evidence controverts the allegations of the complaint, plaintiff may not rely on mere allegations, but must also submit supporting affidavits or documentary evidence.

(Citation omitted.) *Yukon Partners v. Lodge Keeper Group*, 258 Ga. App. 1, 2 (572 SE2d 647) (2002). When examining and deciding jurisdictional issues on a motion to dismiss, a trial court "has discretion to hear oral testimony or to decide the motion on the basis of affidavits and documentary evidence alone pursuant to OCGA § 9-11-43 (b)." (Citation and punctuation omitted.) *Scovill Fasteners v. Sure-Snap Corp.*, 207 Ga. App. 539, 539-540 (428 SE2d 435) (1993). See *Alcatraz Media v. Yahoo! Inc.*, 290 Ga. App. 882, 884 (1) (660 SE2d 797) (2008). If the trial court conducts an evidentiary hearing, it may resolve disputed factual issues, and we will show deference to those findings. See *Alcatraz Media*, 290 Ga. App. at 886 (2); *McLendon v. Albany Warehouse Co.*, 203 Ga. App. 865, 866 (1) (418 SE2d 130) (1992). On the other hand, where, as here, a motion is resolved based solely upon written submissions,[1] "the reviewing court is in an equal position with the trial court to determine the facts and therefore examines the facts under a non-deferential standard," *Scovill Fasteners*, 207 Ga. App. at 540, and we resolve all disputed issues of fact in favor of the party asserting the existence of personal jurisdiction. *Alcatraz Media*, 290 Ga. App. at 884 (1).

## II. The Parties

This case arises out of a private placement venture capital financing transaction. The plaintiff in the underlying action, appellant Hyperdynamics, is a Delaware corporation with its principal place of business in Texas. The defendants in the underlying action consist of four groups of both residents and nonresidents that, for

---

[1] The trial court did conduct a hearing in this case, but heard only legal argument of counsel; it received no live testimony. The Defendants argue that the trial court's findings are nonetheless subject to the any evidence standard of review because the parties submitted deposition transcripts in support of their motions. We disagree. The deposition transcripts alone, in the absence of the benefit of live testimony from which one could make credibility assessments, still fall within the category of written submissions such that this Court is "in an equal position with the trial court to determine the facts." *Scovill Fasteners*, 207 Ga. App. at 540.

the purposes of this opinion, will be referred to collectively as the "Canouse Defendants," the "Hicks Defendants," the "Sims Defendants," and the "Valentine Defendants."

(A) *The Canouse Defendants*. The Canouse Defendants consist of four brothers, Joseph C. Canouse, John C. Canouse, James P. Canouse, and Jeffrey Canouse, all of whom are Georgia residents, as well as several companies which they are alleged to own and/or control: J. P. Carey Securities, Inc.; J. P. Carey Asset Management LLC; Cache Capital (USA), L.P.; and Carpe Diem Ltd. All of the conduct attributed to the Canouse Defendants in this opinion occurred in Georgia, unless otherwise stated. The Canouse Defendants have not challenged personal jurisdiction and are not parties to the instant appeal.

(B) *The Hicks Defendants*. The "Hicks Defendants" consist of Stephen Hicks, a Canadian citizen residing in Connecticut; Southridge Capital Management LLC ("Southridge"), a Delaware limited liability company with its principal place of business in Ridgefield, Connecticut, of which Hicks is managing director; Sovereign Partners, L.P. ("Sovereign"), a fund organized as a Delaware limited partnership; and various entities within a complex multitiered offshore business structure that were created at the direction of Hicks: Livingstone Asset Management Ltd. ("Livingstone"), an international business company; Terrapin Trading LLC ("Terrapin"), an offshore entity organized as a Cayman Islands limited liability company; Dominion Capital Fund, Ltd. ("Dominion"), an offshore fund organized as a Nassau, Bahamas international business company; and Minglewood Capital, LLC ("Minglewood"), a Cayman Islands limited liability company. None of the Hicks Defendants is registered to conduct business in Georgia.

The record shows that Hicks directed and controlled the Hicks Defendants as to the transaction at issue in this case, through a series of advisor agreements, subadvisor agreements, and powers of attorney.[2] The Hicks Defendants successfully challenged personal jurisdiction over them in the trial court and are parties to the instant appeal.

(C) *The Sims Defendants*. The Sims Defendants consist of David Sims, a South African citizen residing in Tortola, British Virgin

---

[2] Since all of the allegedly tortious conduct involving the Hicks Defendants is attributed to both Hicks individually and to each of the entities under his control, all of which are alleged to be part of the conspiracy, it is not necessary to distinguish the entity on whose behalf he was allegedly acting when he undertook any single subject action to determine personal jurisdiction as to him. "[A]n officer of a corporation who takes part in the commission of a tort by the corporation is personally liable for that tort." (Citation and punctuation omitted.) *Mitchell v. Gilwil Group*, 261 Ga. App. 882, 884 (1) (583 SE2d 911) (2003). See also *Moore v. Barge*, 210 Ga. App. 552, 554 (1) (436 SE2d 746) (1993).

Islands, as well as entities owned and/or controlled by Sims: Beacon Capital Management, Ltd. ("Beacon"), an offshore holding company and investment advisor organized as a British Virgin Islands limited partnership; Falcon Secretaries, Ltd. ("Falcon"), a British Virgin Islands international business company; and Navigator Management, Ltd. ("Navigator"), a British Virgin Islands international business company.[3]

The Sims Defendants acted as the sole officer or director to most, if not all, of the Hicks Defendants within the multi-tiered offshore structure.[4] The Sims Defendants successfully challenged personal jurisdiction over them in the trial court and are also parties to the instant appeal.

(D) *The Valentine Defendants*. The Valentine Defendants consist of Mark Valentine,[5] a Canadian citizen residing in Florida, and certain entities which he controlled and/or was affiliated: Thomson Kernaghan & Co., Ltd., a brokerage firm with Valentine as chairman; Canadian Advantage L.P.; and VMH Ltd. Hyperdynamics alleges that the Valentine Defendants directed and/or participated in the Hyperdynamics transaction by executing trades and by the movement of funds and proceeds between and among the Defendants' accounts at Thomson Kernaghan. Hyperdynamics also alleges that Canadian Advantage L.P. provided some of the funding to Wellington in the Hyperdynamics financing transaction at issue in this case. The Valentine Defendants are in default and are not parties to the instant appeal.

## III. The Allegations

(A) *The Conspiracy*. Hyperdynamics alleges that the resident and nonresident defendants have a longstanding business relationship and have, using the complex multi-tiered offshore financial structure created at the direction of Hicks, conspired to engage in fraud and market manipulation involving toxic convertible financing

---

[3] Sims also controlled Wellington, the offshore fund that invested in the Hyperdynamics transaction. Wellington, however, has not challenged jurisdiction in this case.

[4] As was the case with Hicks, all of the allegedly tortious conduct involving the Sims Defendants is attributed to Sims individually as well as each of the entities under his control, all of which are alleged to be part of the conspiracy; thus, it is not necessary to distinguish the entity on whose behalf he was allegedly acting when he undertook any single subject action for the purposes of determining personal jurisdiction as to him. See note 2, supra.

[5] In a transaction unrelated to Hyperdynamics, Valentine pled guilty to securities fraud and was ordered to serve probation. *United States v. Mark Valentine*, District Court for the Southern District of Florida, Criminal Indictment No. 02-80088-CR-Cohn. Thomson Kernaghan & Co., Ltd. is currently in bankruptcy.

transactions[6] with companies seeking private placement investors. According to Hyperdynamics, the collective Defendants have used this offshore financial structure to conceal both the true identity of, and the relationship between, the Defendants when preying upon unsuspecting businesses seeking financing. The Defendants are alleged to enter into toxic convertible financing agreements with the then-present intent to surreptitiously use short sales[7] and naked short sales[8] to manipulate the value of the company's stock by driving the price downward, and to then acquire a majority position in the company upon the conversion of the investor's preferred securities to common stock. In support of this allegation, Hyperdynamics points to the undisputed testimony that the transaction involved in this case did, in fact, involve toxic convertible financing. In addition, Valentine admitted that he had been involved in several toxic convertible financing transactions involving the Canouse Defendants. Hyperdynamics also identified at least 35 other companies in which Hyperdynamics claims one or more of the Canouse Defendants, one or more of the Hicks Defendants, one or more of the Sims Defendants, and one or more of the Valentine Defendants invested, and claims that they each involved toxic convertible financing. Finally, Hyperdynamics filed sworn affidavits from three separate

---

[6] Toxic convertible financing, also referred to as "death spiral" financing, refers to a financing structure whereby a company issues preferred securities to a venture capitalist in exchange for capital using a conversion ratio based upon fluctuating market prices. See generally Deepa Nayini, The Toxic Convertible: Establishing Manipulation in the Wake of Short Sales, 54 Emory L. J. 721, 724, n. 23 (I) (C) (2005). The end result is that, as the price of the underlying stock decreases, the company must issue more stock to the holder of the preferred securities upon receiving a conversion request. Id. at 724-726. This can create an incentive for the convertible security holder to short-sell the company's stock in hopes of driving down the stock price. Id. at 725-727 (I) (D). But so long as the terms of the financial transaction are fully disclosed and the investor does not otherwise engage in fraud or market manipulation, toxic convertible financing is not in itself unlawful. See *ATSI Communication v. The Shaar Fund, Ltd.*, 493 F3d 87, 101-102 (II) (A) (2d Cir. 2007).

[7] As explained in *Securities and Exchange Commission v. Badian*, No. 06Civ2621 (LTS) (DFE), 2008 WL 3914872, at *1, n. 1 (S.D. N.Y. July 11, 2008),

[a]n investor sells short when he sells a security that he does not own by borrowing the security, typically from a broker. At a later date, the investor "covers" his short position by purchasing the security and returning it to the lender. A short seller speculates that the price of the security will drop. If the price drops, the investor profits by covering for less than the short sale price.

(Citations omitted.) In the absence of market manipulation or other fraudulent conduct, short-selling is a lawful, regulated activity. See 17 CFR §§ 242.200-242.203. See also *ATSI Communication*, 493 F3d at 99 (II) (A); James W. Christian et al., Naked Short Selling: How Exposed are Investors?, 43 Hous. L. Rev. 1033, 1041-1044 (II) (A) (2006).

[8] Naked short selling occurs "when a seller sells a security without owning or borrowing it and does not deliver the security when due." (Citation and punctuation omitted.) *In the Matter of Phlo Corp.*, S. E. C. Release No. 55562, 2007 WL 966943, at *4 (II) (C), n. 22 (March 30, 2007). It is unlawful when used to artificially depress the price of a target company's shares. See 17 CFR § 240.10b-5; 17 CFR §§ 242.200-242.203. See also Christian et al., supra, at 1044-1046 (II) (B).

corporate executive officers who alleged that they had also been subject to a common scheme involving various combinations of these Defendants engaging in unlawful toxic convertible financing transactions. Specifically, the corporate executives stated that their respective companies had entered into financial transactions with the Defendants, and that their respective companies each fell victim to fraud and market manipulation in a fashion similar to that which has been alleged in this case.

(B) *The Offshore Structure.* The complaint alleges that in or about early 1999, Stephen Hicks concocted a scheme to manipulate the market in thinly capitalized companies. In furtherance of this alleged scheme, Hicks directed the creation of the multi-tiered offshore structure, consisting of numerous layers of Cayman Island and Bahamian entities, designed both to conceal the identities of the parties involved and to undermine the enforcement of United States securities laws.[9] In support of this allegation, Hyperdynamics has presented documentary evidence produced during discovery that confirmed that the offshore investment structure was "designed to protect [the Hicks Defendants'] respective assets from the risk of certain liabilities that may arise out of their investment in certain [s]ecurities under applicable laws" and that "by implementing a tiered investment structure, [the Hicks Defendants] and their investments may potentially avoid underwriter liability that could arise under the United States securities laws."[10] Further, one of the attorneys involved in creating the offshore entities at Hicks's direction testified that the multi-tiered structure provided "flexibility . . . in the event that an investment did not perform as expected and in the event that that resulted in litigation, perhaps initiated by the company which issued the security, rather than defend against the litigation, you walk away."

The Hicks Defendants engaged the Sims Defendants to provide offshore officer and director services for each entity in the multi-tiered offshore structure. Through a series of contractual advisor

---

[9] One of Hicks's attorneys explained that offshore investment vehicles that are structured so as to be limited to non-United States citizens need not comply with United States securities laws. According to Hyperdynamics, Hicks went to great lengths to make it appear as if the multi-tiered offshore structure was being controlled from outside of the United States, although it was actually being controlled by him, from within the United States.

[10] Hyperdynamics also notes in support of its argument that the Hicks and Sims Defendants continuously asserted that Cayman Island secrecy laws protected from discovery certain information regarding the structure and conduct of the offshore entities. Hyperdynamics also submitted a letter from Sims regarding the Sims Defendants' willingness to provide director services to the Hicks Defendants, in which Sims confirmed a policy that, when served with subpoenas from attorneys acting for companies in which one of the offshore funds had invested, "no information will be provided except under court order, where criminal activity is suspected."

agreements, subadvisor agreements, and powers of attorney, the offshore officers and directors were then authorized to accept direction from Hicks, generally in his capacity as managing director of Southridge.[11]

The Canouse Defendants allegedly conspired with the Hicks Defendants and the Sims Defendants to identify and fraudulently induce companies into the predatory investment scheme, and the Valentine Defendants allegedly executed trades and money transfers in furtherance of the scheme.

(C) *The Hyperdynamics Transaction.* In 1999, Hyperdynamics, a publicly traded corporation, engaged the services of the Canouse Defendants in order to facilitate its attempt to find investors who would provide it with capital in connection with a proposed private stock offering. Hyperdynamics and the Canouse Defendants, specifically J. P. Carey Securities, Inc., entered into an "Engagement Agreement" by which the Canouse Defendants agreed to act as a consultant to Hyperdynamics for the purpose of introducing Hyperdynamics to up to 25 potential investors. The Engagement Agreement expressly provided that any potential investor introduced by the Canouse Defendants would be an "accredited investor[ ]" as that term is defined in Regulation D of the federal securities regulations. See 17 CFR § 230.501 (a). The funding was to be achieved through an initial $2 million convertible preferred stock purchase, and a subsequent $5 million equity line.

The Canouse Defendants forwarded to the Hicks Defendants and the Valentine Defendants information related to Hyperdynamics' investor needs and its business plan. The Canouse Defendants included a letter in which they stated that they had "a big interest in this deal," and therefore "only sent it to [Hicks] and Mark Valentine to participate."

The Canouse Defendants subsequently provided Hyperdynamics with the names of five potential investors, including "The Atlantis Fund"; "Cache Capital"; "Carpe Diem"; "Wellington LLC"; and "The GPS America Fund."[12] All of the potential investors presented

---

[11] For example, Hyperdynamics presented evidence in support of its contention that Livingstone was formed at the direction of Hicks, who acted as its president. Sims was the sole director. Livingstone acted as advisor to Dominion, Terrapin, Minglewood, and Wellington, and received a general power of attorney which allowed it to conduct all business on behalf of those entities as agent and attorney in fact. Livingstone further acted as advisor and had power of attorney over Southridge, of which Hicks was managing director. Livingstone subsequently delegated all of its authority to Southridge, which then acted as subadvisor to Dominion, Terrapin, Minglewood, and Wellington. The Sims Defendants, namely Navigator and Falcon, acted as the sole director and sole officer, respectively, of Terrapin, Minglewood, and Wellington; those entities were "pass-through entities," and otherwise had no human owners, directors, officers, or employees and no physical offices.

[12] Hyperdynamics contends that the Canouse Defendants intentionally failed to include

YALE LAW LIBRARY

to Hyperdynamics by the Canouse Defendants were either owned and/or controlled by the Canouse Defendants and/or the Hicks Defendants, a fact allegedly unknown to Hyperdynamics. Hyperdynamics alleges that the Canouse Defendants intentionally concealed their relationship to the two potential investors in which they had a financial interest, namely Cache Capital (USA), L.P. and Carpe Diem Ltd. Hyperdynamics further alleges that the Canouse Defendants intentionally concealed the fact that, in the case of Wellington, the funds that were to be invested were being funneled through several offshore entities, and that Wellington was created for the sole purpose of this financial transaction. Finally, Hyperdynamics alleges that the Canouse Defendants made no effort to ensure that the potential investors, including Wellington, were in fact accredited investors.

Hyperdynamics thereafter entered into negotiations with Cache, Carpe Diem, and Wellington. During the negotiations, Hicks dictated the proposed terms regarding the financial transaction to the Canouse Defendants, who then compiled those terms into a term sheet.[13] At Hicks's request, the Canouse Defendants then submitted the term sheet to Hyperdynamics, as well as to the Georgia attorney who had been retained by the Canouse Defendants to draft the transaction documents. Hyperdynamics' lawyer also relayed desired transaction terms to the Georgia lawyer. Throughout the negotiation process, all communications from the Hicks Defendants were transmitted to the Georgia attorney through the Canouse Defendants.

Hyperdynamics ultimately entered into Subscription Agreements for an aggregate $3 million worth of convertible preferred stock with Cache, Carpe Diem, and Wellington. The Georgia attorney finalized the Subscription Agreements and the supporting documentation for each entity, including a Registration Rights Agreement, a Warrant Agreement, an Escrow Agreement, a Certificate of Designation, and an Opinion of Counsel. At the request of the Canouse Defendants, the Georgia attorney then submitted the documents via e-mail directly to the Hicks Defendants. Sims, on behalf of the Sims Defendants and Wellington, executed the signature pages for the Wellington Subscription Agreement and supporting documents and forwarded them both by fax and by Federal Express to the Georgia attorney. Joseph Canouse executed the Subscription Agreements on behalf of Cache and Carpe Diem. The Georgia attorney then sent the

the correct legal name of the entities in furtherance of their effort to conceal the true identity of the potential investors and their own self-dealing.

[13] Hicks also provided the Canouse Defendants with the proposed terms for Hyperdynamics' equity line.

Subscription Agreements to Hyperdynamics.[14]

In conjunction with the execution of the documents, the Hicks Defendants instructed the Sims Defendants to conduct certain wire transfers in and among the offshore entities to fund the transaction, and the instructions were then passed on to the Valentine Defendants. Money related to the financial transaction was also wired out of Cache's bank account located in Georgia.

Hyperdynamics alleges that the Subscription Agreements and supporting documents drafted by the Georgia attorney at the direction of the Canouse Defendants and Hicks Defendants and executed by the Sims Defendants contained a fraudulent statement regarding Wellington's accredited investor status[15] and that, in fact, Wellington was not an accredited investor.[16] Hyperdynamics has submitted deposition testimony which could support a finding that the Defendants were aware that the statement was false at the time that it was allegedly made, and further that the Canouses did nothing to verify that Wellington was an accredited investor. Hyperdynamics further alleges that it had agreed to enter into the financial transaction in reliance upon the Canouse Defendants' representation that each of the potential investors was in fact an accredited investor.

According to the complaint, immediately following the execution of the Subscription Agreements, and in direct violation of specific terms contained within those agreements, the collective Defendants engaged in a massive campaign of overselling and short-selling Hyperdynamics common stock that was designed to manipulate the market for Hyperdynamics securities downward, into a "death spiral," and that it did, in fact, depress the value of Hyperdynamics securities. They then allegedly covered some or all of their short sales by converting a portion of the Hyperdynamics preferred stock into common stock. Hyperdynamics also alleges that the Defendants repeatedly and intentionally violated the selling limitation contained within the Subscription Agreement[17] with respect to the conversion shares.[18]

---

[14] According to Hyperdynamics, the Canouse Defendants received $211,000 for their role as placement agent in the transaction.

[15] Specifically, contrary to representations allegedly made in the Subscription Agreement, Hyperdynamics alleges that Wellington did not have assets in excess of $5 million at the time it made its investment in Hyperdynamics, that Wellington was created for the sole purpose of making an investment in Hyperdynamics, and that it had not made any investments prior to its investment in Hyperdynamics.

[16] The record contains two different versions of the document containing the alleged misrepresentation, and a question of fact remains as to which version was actually executed by Sims.

[17] The complaint details specific sales that Hyperdynamics alleges were in violation of the terms of the Subscription Agreements.

[18] When Hyperdynamics suspected the breaches, the contracting parties amended the

Hyperdynamics asserts that the allegedly unlawful sales by Wellington were directed and controlled by the Hicks Defendants, the Sims Defendants, and the Valentine Defendants. The alleged unlawful sales by Cache and Carpe Diem were directed and controlled by the Canouse Defendants and the Valentine Defendants.

Hyperdynamics further alleges that the collective Defendants knowingly, wilfully and deliberately coordinated their alleged illegal selling tactics in an effort to manipulate the market for Hyperdynamics securities and maximize their profits, and that they were motivated by an intent and desire to own a majority of Hyperdynamics common shares of stock and take over control of Hyperdynamics. Prior to that happening, Hyperdynamics suspended all conversion requests made by the Defendants of their preferred stock into common stock.[19]

Finally, Hyperdynamics alleges the collective Defendants engaged in a coordinated effort to conceal the allegedly unlawful trades. In support of this allegation, Hyperdynamics contends that the Hicks Defendants and the Sims Defendants have given false explanations for known trade discrepancies and that the Canouse Defendants fraudulently "doctored" trading records. And Hyperdynamics points to the collective Defendants' alleged discovery abuses as evidence of the continuing nature of the alleged conspiracy.

Hyperdynamics sued the collective Defendants alleging against one or all of them claims of breach of contract; fraud; negligent misrepresentation; misfeasance; malfeasance, and breaches of fiduciary duties; unjust enrichment, restitution, and disgorgement; fraudulent conveyance; indemnification; tortious interference with contracts; conversion; violations of the Georgia Securities Act of 1973; violations of the Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act, OCGA § 16-14-1 et seq.; civil conspiracy; personal liability and alter ego; and has pled entitlement to punitive damages and attorney fees.

## IV. Analysis

Hyperdynamics contends that the collective Defendants engaged in a conspiracy to defraud Hyperdynamics by inducing it to enter into a contract through fraud and concealment, the intention of which was to covertly take over majority ownership of Hyperdynamics. Hyperdynamics further contends that the conspiracy among the

---

selling restrictions contained within the Subscription Agreements. Hyperdynamics contends that the alleged unlawful sales nonetheless continued.

[19] Hyperdynamics' suspension of the stock conversions resulted in Wellington filing suit against Hyperdynamics in the State of Delaware. Wellington transferred its claims into the instant action, and therefore does not dispute jurisdiction in Georgia.

resident and nonresident Defendants offered sufficient connection to Georgia to confer jurisdiction over the Hicks Defendants and the Sims Defendants. We agree.

Georgia courts will exercise long arm jurisdiction over nonresident defendants when (A) the nonresident has committed, in person or through an agent, one of the acts set forth in the Georgia Long Arm Statute, OCGA § 9-10-91; and (B) the exercise of jurisdiction comports with due process. *Innovative Clinical &c. Svcs. v. First Nat. Bank &c.*, 279 Ga. 672, 673 (620 SE2d 352) (2005); *Gust v. Flint*, 257 Ga. 129, 130 (356 SE2d 513) (1987).

(A) The Georgia Long Arm Statute authorizes the exercise of personal jurisdiction over a nonresident defendant "as to a cause of action arising from any of the acts [or] omissions . . . if in person or through an agent, he . . . : (1) [t]ransacts any business within this state;[20] [or] (2) [c]ommits a tortious act or omission within this state[.]" OCGA § 9-10-91 (1), (2). Admittedly, the question as to whether either the Hicks Defendants or the Sims Defendants, independently, committed in Georgia any of the necessary acts set forth above is a close one.

Georgia recognizes, and this Court has expressly adopted, the concept of conspiracy jurisdiction. *Rudo v. Stubbs*, 221 Ga. App. 702, 703-704 (1) (a) (472 SE2d 515) (1996).[21] "A conspiracy is a combina-

---

[20] At the time that the trial court rendered its decision in this case, limitations not found within the literal text of the statute had been applied to the jurisdictional analysis under OCGA § 9-10-91 (1) to establish whether a nonresident defendant had "transact[ed] any business within this state." See, e.g., *Wise v. State Bd. &c. of Architects*, 247 Ga. 206, 209-210 (2) (274 SE2d 544) (1981) (interpreting subsection (1) in a manner that minimized the importance of a nonresident defendant's indirect Georgia contacts – i.e., telephone calls, facsimiles, mail, and e-mails); *Whitaker v. Krestmark of Alabama*, 157 Ga. App. 536, 537-538 (1) (278 SE2d 116) (1981) (limiting the application of subsection (1) to contract actions). In *Innovative Clinical &c. Svcs.*, 279 Ga. at 675, our Supreme Court overruled all cases taking a narrow view of subsection (1), instead clarifying that, if a cause of action arises out of conduct within this state, "OCGA § 9-10-91 (1) grants Georgia courts the unlimited authority to exercise personal jurisdiction over any nonresident who transacts any business in this State . . . to the maximum extent permitted by procedural due process." The Court noted that "nothing in subsection (1) requires the physical presence of the nonresident in Georgia or minimizes the import of a nonresident's intangible contacts with the State." (Punctuation omitted.) Id.

Because we conclude that the resident defendants' actions within Georgia can be imputed to the nonresident defendants in this case, *Innovative Clinical &c. Svcs.* has very little application to our analysis. But, we do acknowledge the Supreme Court's directive that, with respect to nonresident defendants who transact business in this State, we are to take an expansive view of the perimeters of our jurisdictional reach under OCGA § 9-10-91 (1).

[21] Contrary to the contention made by the collective Defendants, we do not read *Rudo* to limit the exercise of conspiracy jurisdiction exclusively to situations involving a Georgia plaintiff. Although the involvement of a Georgia plaintiff provided the necessary evidence that the co-conspirators in *Rudo* had "purposefully directed their activities toward Georgia" so as to meet the minimum due process requirements, nothing in *Rudo* suggests that the existence of a Georgia plaintiff is the only method by which due process can be met. 221 Ga. App. at 704 (1) (a).

YALE LAW LIBRARY

tion of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." (Citation and punctuation omitted.) *U. S. Anchor Mfg. v. Rule Indus.*, 264 Ga. 295, 297 (1) (443 SE2d 833) (1994). See *Cook v. Robinson*, 216 Ga. 328, 328 (1) (116 SE2d 742) (1960). The theory of conspiracy jurisdiction is based upon the notion that the acts of one conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy. See *Insight Technology v. FreightCheck*, 280 Ga. App. 19, 24 (1) (a) (633 SE2d 373) (2006) ("In all cases, a person who maliciously procures an injury to be done to another, whether an actionable wrong or a breach of contract, is a joint wrongdoer and may be subject to an action either alone or jointly with the person who actually committed the injury.") (punctuation and emphasis omitted). See generally *Cook*, 216 Ga. at 329 (4); *Savannah College of Art &c. v. School of Visual Arts &c.*, 219 Ga. App. 296, 297 (464 SE2d 895) (1995). Likewise, under the theory of conspiracy jurisdiction, the in-state acts of a resident co-conspirator may be imputed to a nonresident co-conspirator so as to satisfy the specific contact requirements of the Georgia Long Arm Statute. See *Rudo*, 221 Ga. App. at 703 (1) (a). See also *Dixie Homecrafters v. Homecrafters of America*, No. 1:08-CV-0649-JOF, 2009 WL 596009, at *7 (II) (B) (N.D. Ga. March 5, 2009). Accord *Textor v. Bd. of Regents of Northern Illinois Univ.*, 711 F2d 1387, 1392-1393 (I) (C) (7th Cir. 1983); *Gemini Enterprises v. WFMY Television Corp.*, 470 FSupp. 559, 564-565 (M.D. N.C. 1979); *Mandelkorn v. Patrick*, 359 FSupp. 692, 694-697 (I) (D. D.C. 1973); *Instituto Bancario Italiano v. Hunter Engineering Co.*, 449 A2d 210, 222-226 (III) (A), (B) (Del. 1982).

Significantly,

> [t]he law recognizes the intrinsic difficulty of proving a conspiracy. The conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances. To show conspiracy, it is not necessary to prove an express compact or agreement to the parties thereto. The essential element of the charge is the common design; but it need not appear that the parties met together either formally or informally and entered into any explicit or formal agreement; nor is it essential that it should appear that either by words or by writing they formulated their unlawful objects. It is sufficient that two or more persons in any manner either positively or tacitly come to a mutual understanding that they will accomplish the unlawful design.

*Nottingham v. Wrigley*, 221 Ga. 386, 388 (144 SE2d 749) (1965). See

also *Dee v. Sweet*, 218 Ga. App. 18, 22 (4) (460 SE2d 110) (1995); *Hodges-Ward Assoc. v. Ecclestone*, 156 Ga. App. 59, 62 (1) (273 SE2d 872) (1980); *Grainger v. Jackson*, 122 Ga. App. 123, 128 (2) (176 SE2d 279) (1970).

Construing the record in the light most favorable to the exercise of personal jurisdiction, we conclude that Hyperdynamics has submitted sufficient documentary evidence to show that Defendants engaged in a conspiracy to defraud Hyperdynamics so as to warrant the exercise of personal jurisdiction over the Hicks Defendants and the Sims Defendants.[22] The allegations, which find some support in the record, from which a jury could infer the existence of a conspiracy between and among the Defendants include: the longstanding business relationship between the Defendants and their undisputed involvement in toxic convertible financing; the admitted nature and purpose of the complex offshore financial structure created at the direction of Hicks and used in the Defendants' business transactions to avoid liability and enforcement of United States securities laws; the alleged concealment by the Canouse Defendants of the identity of and their relationship to the proposed investors; the alleged concealment by the Canouse Defendants of their alleged financial interest in Cache and Carpe Diem; the alleged failure of the Canouse Defendants to verify the accredited investor status of Wellington; the alleged misrepresentation contained within the Wellington Subscription Agreement regarding its accredited investment status and the Hicks Defendants' and the Sims Defendants' alleged awareness of its falsity; the immediate deflation of Hyperdynamics' stock price upon entering into the financial transaction with the Defendants; the Defendants' alleged violations of the trading restrictions contained within the Subscription Agreements; the Defendants' alleged "doctoring" of the trading records; and the sworn testimony of other corporate executives who claim that the Defendants engaged in a common fraudulent scheme against their companies.

The Defendants' assertion that toxic convertible financing is not in itself unlawful does not change this result. Multiple persons can engage in a conspiracy "to accomplish an unlawful end *or* to accomplish a lawful end by unlawful means." (Citation and punctuation omitted; emphasis supplied.) *U. S. Anchor Mfg.*, 264 Ga. at 297 (1). Even if it is determined that the Defendants' conduct with respect to the alleged trading of Hyperdynamics securities would not, standing alone, be unlawful, Hyperdynamics has still sufficiently alleged fraudulent conduct related to the Defendants' inducement of

---

[22] We express no opinion as to the resolution of the merits of this case.

Hyperdynamics into the financial transaction with the alleged then-present intent of not honoring the Subscription Agreements.

> Where a contract between one of the conspirators and the intended victim is employed, without the knowledge of the [victim], as the means of effectuating the scheme previously conceived in the conspiracy, such contract is clothed in fraud; and where the ultimate consummation of the scheme is dependent on and is cloaked in the exercise of a right expressly provided by the contract, neither the color nor the immunity of contract will save the act from the ingredient of tort.

*Patterson-Pope Motor Co. v. Ford Motor Co.*, 66 Ga. App. 41 (16 SE2d 877) (1941).

It follows that, under the theory of conspiracy jurisdiction, the in-state acts of the Canouse Defendants can be imputed to the Hicks Defendants and the Sims Defendants so as to satisfy the specific contact requirements set forth in OCGA § 9-10-91.

(B) Georgia's exercise of personal jurisdiction over the Hicks Defendants and the Sims Defendants does not offend due process; the record contains sufficient evidence that, in relation to this transaction, they each purposefully directed their activities toward Georgia and could reasonably expect to be haled into court here. See *Sky Shots Aerial Photography v. Franks*, 250 Ga. App. 411, 412 (551 SE2d 805) (2001); *Rudo*, 221 Ga. App. at 703-704 (1) (a).

> Due process requires that individuals have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign. In evaluating whether a defendant could reasonably expect to be haled into court in a particular forum, courts examine defendant's contacts with the state, focusing on whether (1) defendant has done some act to avail himself of the law of the forum state; (2) the claim is related to those acts; and (3) the exercise of jurisdiction is reasonable, that is, it does not violate notions of fair play and substantial justice. These three elements do not constitute a due process formula, but are helpful analytical tools which ensure that a defendant is not forced to litigate in a jurisdiction solely as a result of "random," "fortuitous" or "attenuated" contacts.

(Citations and punctuation omitted.) *ATCO Sign &c. Co. v. Stamm Mfg.*, 298 Ga. App. 528, 534 (680 SE2d 571) (2009). See also *Vibratech, Inc. v. Frost*, 291 Ga. App. 133, 137 (1) (a) (661 SE2d 185)

(2008); *Aero Toy Store v. Grieves*, 279 Ga. App. 515, 517-518 (1) (631 SE2d 734) (2006). Further, "a single event may be a sufficient basis for the exercise of long arm jurisdiction if its effects within the forum are substantial enough even though the nonresident has never been physically present in the state." *Aero Toy Store*, 279 Ga. App. at 520.

Construed in favor of the exercise of personal jurisdiction, there was some evidence reflecting the following facts. The Hicks Defendants knowingly and purposefully participated in an allegedly fraudulent financial transaction involving the resident Canouse Defendants, as they had allegedly done on numerous other occasions. The Hicks Defendants used the Canouse Defendants as a conduit during the contract negotiations with Hyperdynamics, allegedly to aid in concealing their true identity. Hicks personally dictated contract terms to the Canouse Defendants with the intention and expectation that the Canouse Defendants would then relay those terms to the Georgia attorney for the express purpose of creating the documents that formed the foundation of the financial transaction. And finally, the documents containing the allegedly false representation regarding Wellington were, with Hicks's conscious awareness, created in and distributed from Georgia.

There was also some evidence that the Sims Defendants, acting consistently with their longstanding business relationship, also knowingly and purposefully participated in an allegedly fraudulent financial transaction with the resident Canouse Defendants. The Sims Defendants funded the Hyperdynamics transaction in conjunction with two entities knowingly controlled by the Georgia residents. The Sims Defendants were aware that the documents representing the linchpin of the Hyperdynamics transaction were being directed by the Canouse Defendants and drafted in Georgia by the Georgia attorney. The Sims Defendants executed the Wellington Subscription Agreement containing the allegedly fraudulent statement, as well as the supporting documentation. And finally, the Sims Defendants knowingly forwarded the executed documents to the Georgia attorney via both fax and Federal Express, with the intention and expectation that they then be distributed.

Under these circumstances, we conclude that neither the Hicks Defendants nor the Sims Defendants are being forced to litigate in Georgia "solely as a result of random, fortuitous or attenuated contacts." (Citation and punctuation omitted.) *ATCO Sign &c. Co.*, 298 Ga. App. at 534. See generally *Vibratech*, 291 Ga. App. at 136-140 (1) (a); *Aero Toy Store*, 279 Ga. App. at 521-524 (1); *Rudo*, 221 Ga. App. at 704 (1) (a). Compare *Yukon Partners*, 258 Ga. App. at 5-9; *Sky Shots Aerial Photography*, 250 Ga. App. at 412-413; *Coopers & Lybrand v. Cocklereece*, 157 Ga. App. 240, 243-244 (1) (276 SE2d 845) (1981). Rather, construing the record in the light most favorable to

jurisdiction, sufficient evidence has been presented to support a finding that the Hicks Defendants and the Sims Defendants took deliberate actions directed toward the State of Georgia designed to facilitate a potentially lucrative business opportunity in conjunction with the resident Canouse Defendants. We further conclude that Georgia has a substantial interest in adjudicating claims related to allegedly fraudulent conduct that is contrived within its borders and involves its residents, even in the absence of a Georgia plaintiff.

For these reasons, we reverse the trial court's dismissal of the Hicks Defendants and the Sims Defendants on the basis of lack of personal jurisdiction.

*Judgment reversed. Miller, C. J., concurs. Phipps, P. J., concurs in judgment only.*

DECIDED JULY 16, 2010 — 

*Edmond & Lindsay, Michael E. Perez, Charles M. Cork III, Mark F. Dehler*, for appellant.

*Mark E. Grantham, Anthony D. Lehman*, for appellees.

*Schklar, Ney & Heim, Edwin J. Schklar, William B. Ney*, amici curiae.