**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J., and BOGGS, J.**

**NOTICE: Motions for reconsideration must be physically received in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 15, 2015**

# In the Court of Appeals of Georgia

A15A0125. AMERICAN MANAGEMENT SERVICES EAST, LLC
et al. v. FORT BENNING FAMILY COMMUNITIES, LLC
et al.

PHIPPS, Presiding Judge.

This appeal from two summary judgment orders is the third appearance of this case before this court.[1] In *American Management I*, the court stated the facts as follows.

> Appellees Fort Benning Family Communities, LLC ("FBFC") and Fort
> Belvoir Residential Communities, LLC ("BRC") are owners of military
> housing projects at Fort Benning, Georgia and Fort Belvoir, Virginia.
> On May 20, 2010, they filed a complaint in Muscogee County Superior
> Court seeking a declaratory judgment that their property management

---

[1] See *American Management Svcs. East v. Fort Benning Family Communities*, 318 Ga. App. 827 (734 SE2d 833) (2012) (hereinafter "*American Management II*"); *American Management Svcs. East v. Fort Benning Family Communities*, 313 Ga. App. 124 (720 SE2d 377) (2011) (hereinafter "*American Management I*").

agreements with appellant American Management Services East LLC ("AMSE"), their property manager, automatically terminated for cause because of AMSE's misconduct. They also alleged breach of fiduciary duty, fraud, conspiracy to commit fraud, and unjust enrichment, and sought an accounting.[2] The parent company, American Management Services LLC d/b/a Pinnacle ("AMS"), was also named in the action.[3]

AMS, a property management firm . . . , and Clark Realty, a national general building contractor, entered into a joint venture known as "Clark Pinnacle," to bid on military housing privatization projects. Clark Pinnacle won four bids to establish private military housing facilities, including projects at Fort Benning and Fort Belvoir. Clark Pinnacle created limited liability companies ("Clark Pinnacle LLCs") to manage each project, which were 70 percent owned by Clark and 30 percent owned by Pinnacle. It formed Clark Pinnacle Belvoir, LLC to operate the Fort Belvoir facility and Clark Pinnacle Benning, LLC to operate the Fort Benning facility. In addition, each LLC had a Clark manager and Pinnacle manager, whose duties were defined by the LLC's operating agreement.[4]

---

[2] FBFC and BRC also asserted in their complaint a claim against American Management Services LLC, d/b/a Pinnacle for allegedly aiding and abetting the breach of fiduciary duty.

[3] *American Management I*, supra at 124-125.

[4] Id. at 125-126.

2

Clark Pinnacle Benning LLC and the United States Army thereafter entered into a limited liability company operating agreement to form FBFC whose purpose was to develop and operate the Fort Benning location. Likewise, BRC was formed under a similar agreement between Clark Pinnacle Belvoir, LLC and the Army to develop and operate the Fort Belvoir facility. FBFC and BRC entered into property management agreements with AMSE for the Fort Benning and Fort Belvoir facilities.[5]

In *American Management I*, AMS and AMSE (hereinafter collectively "Pinnacle") appealed the trial court's grant of Fort Benning Family Communities LLC (hereinafter "FBFC") and Fort Belvoir Residential Communities, LLC's (hereinafter "FBRC") motion to enjoin Pinnacle from pursuing a Virginia action, which action it filed after it had filed in the instant (Georgia) suit an answer, counterclaim, motion to dismiss the action, and motion to dismiss the declaratory judgment claim related to the termination of the Fort Belvoir property management agreement ("PMA") under the doctrine of forum non conveniens. Pinnacle also appealed the trial court's denial of its motion to dismiss the declaratory judgment claim for forum non conveniens.[6] This court affirmed the judgment of the trial court.[7]

---

[5] Id. at 126 (footnote omitted).

[6] Id. at 125.

[7] Id. at 131.

In *American Management II*, Pinnacle appealed the trial court's order (entered October 2011) which lifted the restriction in an earlier injunction that had prohibited FBRC from removing Pinnacle as property manager at the Fort Belvoir facility.[8] This court affirmed that judgment, too.[9]

While *American Management II* was on appeal, Pinnacle filed in the instant action an amended counterclaim, adding, inter alia, a claim against FBFC alleging breach of contract for wrongful termination; Pinnacle asserted that in June 2010, it was "physically . . . forced out . . . as the property manager," and "others" were installed to perform its duties. Pinnacle later filed a "Second Amended Counterclaim," wherein it, among other things, added a claim against FBRC for breach of contract for wrongful termination.

FBFC and FBRC (hereinafter, collectively "the Owners") amended their complaint seven times, ultimately dropping their claims for declaratory judgment as to whether their PMAs with Pinnacle automatically terminated for cause, adding a claim for violation of Georgia's RICO statute, and maintaining their initial claims for

---

[8] *American Mangement II*, supra at 828.

[9] Id. at 834.

4

breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, conspiracy to commit fraud, and unjust enrichment.

On January 17, 2014, the Owners filed a motion for summary judgment, which they later amended after Pinnacle filed its second amended counterclaim; in an amended brief the Owners asserted that they were entitled to judgment as a matter law on four counts of Pinnacle's second amended counterclaim, which counts alleged a breach of contract for wrongful termination of both PMAs (two counts), the failure to pay AMSE for reimbursable expenses, and the failure to pay AMSE a certain fee for supervising a mold abatement project to completion and under budget. On January 24, 2014, Pinnacle filed a motion for partial summary judgment as to claims alleged in the Owners' seventh amended complaint, including those for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, conspiracy to commit fraud, RICO, and unjust enrichment.

On March 20, 2014, the trial court entered an order granting the Owners' motion for summary judgment as to Pinnacle's two wrongful termination claims, and denying the Owners' motion with regard to Pinnacle's claims based on the failure to pay AMSE the expenses and fee (as set out above). On the same day, in a separate

order, the trial court denied Pinnacle's motion for partial summary judgment with regard to the Owners' complaint. It is from these two orders that Pinnacle appeals.

On appeal, Pinnacle contends that the trial court erred by: (1) granting summary judgment in favor of the Owners as to AMSE's counterclaim for wrongful termination of the PMAs; (2) failing to apply Virginia's economic loss rule to bar FBRC's tort claims; (3) denying Pinnacle's motion for summary judgment as to the Owners' claim for breach of fiduciary duty; (4) denying Pinnacle's motion for summary judgment as to the Owners' claim for aiding and abetting a breach of fiduciary duty; (5) denying Pinnacle's motion for summary judgment as to FBRC's claims under Georgia's RICO statute; and (6) denying Pinnacle's motion for summary judgment as to the Owners' unjust enrichment claim.

*Appeal of Order Partially Granting the Owners' Motion for Summary Judgment*

1. To support its contention that the trial court erred by granting summary judgment in favor of the Owners on Pinnacle's counterclaim alleging breach of contract for wrongful termination of the PMAs, Pinnacle advances several arguments. Pinnacle argues that: (a) statements in affidavits upon which the trial court relied "raised myriad issues of disputed facts"; (b) the Owners failed to give Pinnacle notice

6

of an alleged default and an opportunity to cure any default, as required by the PMAs; (c) the Owners' termination of the PMAs was based on an allegation of fraud, rather than on a determination of fraud (which determination was for a jury to make); and to the extent that the trial court relied on "misconduct" as a basis to terminate the PMAs, that term is not defined in the PMAs and could not serve as a basis for the trial court's summary judgment ruling; (d) because the Owners "had discretion over whether to terminate the PMAs in the event of fraud; that is, they could elect the remedy or waive it," the default provision was not automatically triggered in the event of fraud; (e) it was for the jury to decide whether the Owners had complied with an "implied covenant of good faith and fair dealing" in their termination of AMSE, and the evidence showed that the Owners did not act in good faith in that regard; (f) the Owners' removal of Pinnacle violated "Project Operating Agreements"; and (g) the PMAs' "insurance clause precludes automatic termination."

> To prevail at summary judgment . . . the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If

7

there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial. . . . If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[10]

(a) Pinnacle argues that statements in affidavits upon which the trial court relied "raised myriad issues of disputed facts," precluding summary judgment.

The PMAs provided that AMSE would receive an annual base fee (plus reimbursement of certain expenses) as well as the opportunity to earn a property management incentive fee. AMSE's incentive fee was based on various factors, including its timeliness (evaluated on a "pass/fail" basis ) in responding to resident requests for maintenance; the requests were entered by Pinnacle as "work orders" into a certain database utilized by Pinnacle. An investigation undertaken at Pinnacle's behest revealed that although managers at Fort Belvoir did not direct employees to enter false reports into the database, several Pinnacle associates had sometimes done so. The investigator's report read:

---

[10] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991) (citations omitted).

The allegation that associates improperly updated work order data was substantiated. In interviews, two Maintenance Supervisors admitted to changing work order start dates and times for the sole reason of making the work orders meet the response times criteria. Sample data available from e-mail records, financial reports and the maintenance database showed at least nine associates changed work order date and time information decreasing the number of failing work orders by more than 80% for three of seven months where sufficiently detailed data was available for analysis. An analysis of less detailed data for the entire 59 month period under review found a total of eight months with work order update patterns similar to those observed in the detailed data analysis. The number of late-updated work orders, the associates making the updates, and the manner in which the work orders were changed was not consistent with the mere correction of data entry errors.

In moving for summary judgment, the Owners presented sworn affidavits and excerpts of deposition testimony of former AMSE employees at Fort Belvoir and Fort Benning purporting to show that they admitted to falsifying work order data to improve or increase "pass percentage," which resulted in overpayments of management incentive fees. Pinnacle responded by filing a brief opposing the Owners' summary judgment motion and a separate response to the Owners' statement of theories of recovery and material fact. In the latter document, Pinnacle disputed allegations of employee misconduct by pointing to other evidence in the record

purporting to show conflicts in the employees' statements. In neither its brief opposing the Owners' summary judgment motion, nor in a supplemental response brief later filed, did Pinnacle attempt to counter the misconduct evidence adduced by the Owners, instead limiting its response to reasons it claimed the PMAs did not terminate automatically, and to the Owners' purported breach of a duty of good faith and fair dealing.

On appeal, Pinnacle argues that evidence of the following precluded a grant of summary judgment to the Owners: employees made conflicting statements regarding whether they had falsified data or were instructed by supervisors to falsify data; although some employees testified that certain supervisors had instructed them to change data inputs, the accused supervisors denied the allegations; and some employees had credibility issues. In its order granting (partial) summary judgment to the Owners, the trial court referenced testimony of the following three former Pinnacle employees, and concluded that "[t]hese unrebutted admissions conclusively establish that Pinnacle employees engaged in intentional misconduct."

(i) *Wanda Gotay*. The Owners attached to their motion for summary judgment an affidavit Gotay had executed and an excerpt of Gotay's deposition testimony. The affidavit showed that Gotay had worked for Pinnacle at Fort Belvoir. The deposition

excerpt included her testimony that she had falsified work orders, "changing fails to passes," by "selecting a time that [she] would make up that fell within the pass range for that specific type of work order." Gotay testified that in addition to changing "fails" to "passes," she would, at the direction of a supervisor, "close out" work orders she believed had not actually been completed.

In its appeal brief, Pinnacle points out that in Gotay's deposition, Gotay admitted that (prior to the deposition) she had been interviewed by Pinnacle's investigator and at that time denied having changed date and time information.[11] Pinnacle also points out that although Gotay deposed that she changed work order data because a supervisor had instructed her to do so, one supervisor she named denied the accusations, and the evidence showed that another supervisor she named had requested that work order data be accurate.

By their own terms, the PMAs terminated upon the requisite acts committed by Pinnacle or its "employees" or agents. Therefore, whether Gotay's data was

---

[11] Notably, Pinnacle did not point out this fact to the trial court in either one of its briefs opposing the Owners' summary judgment motion. Notwithstanding, this court will consider the evidence. At the time of the hearing on the summary judgment motion, a complete transcript of Gotay's deposition testimony had been filed in the trial court, and the trial court's judgment on appeal pertinently states that it was entered "[a]fter hearing arguments, considering all of the evidence and all other matters of record."

11

falsified at the behest of a supervisor was immaterial, and any conflict in the evidence regarding that issue could not work to preclude summary judgment.[12] On the other hand, whether Gotay (herself) falsified data was a material fact. "[E]vidence offered on motion for summary judgment is held to the same standards of admissibility as evidence at trial."[13] When a witness "admits making [a] prior inconsistent statement, evidence of that statement is admissible because the jury may . . . consider the inconsistent statement as substantive evidence,"[14] as well as for impeachment purposes.[15] The statement Gotay made in deposition (that she had falsified data)

---

[12] See *OnBrand Media v. Codex Consulting*, 301 Ga. App. 141, 144 (1) (687 SE2d 168) (2009) ("factual disputes regarding immaterial issues do not preclude summary judgment") (footnote omitted); *Wood v. Metro. Atlanta Girls' Club*, 141 Ga. App. 473, 474 (2) (233 SE2d 862) (1977) ("[A] dispute as to an immaterial fact does not preclude summary judgment.") (citations omitted).

[13] *Taylor v. Golden Corral Corp.*, 255 Ga. App. 860, 862 (1) (567 SE2d 109) (2002) (citation and punctuation omitted).

[14] *Waldrup v. Baker*, 180 Ga. App. 121, 122 (1) (348 SE2d 566) (1986). See *Duckworth v. State*, 268 Ga. 566, 568 (1) (492 SE2d 201) (1997) ("prior inconsistent statements are admissible as substantive evidence when the witness is present at trial and subject to cross-examination"); OCGA § 24-8-801 (d) (1) (A).

[15] *McNair v. State*, 330 Ga. App. 478, 481-482 (1) (a) (767 SE2d 290) (2014) ("The evidentiary rules pertaining to examining witnesses on their prior inconsistent statements and using those statements for impeachment purposes or as substantive evidence are currently codified at OCGA §§ 24-6-613 and 24-8-801 (d) (1) (A).") (footnotes omitted).

contradicted the statement she had made earlier to an investigator (that she had not falsified data). Because the evidence was in dispute on that material fact, Gotay's later admission (that she had falsified data) should not have served as a basis upon which summary judgment was granted, and the trial court erred by concluding that Gotay's admission of misconduct was "unrebutted" and "conclusively establish[ed] that Pinnacle employees engaged in intentional misconduct" at Fort Belvoir.[16] But our inquiry does not end here.

"On appeal we review the trial court's grant of summary judgment de novo to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact."[17] In this case, the trial court stated that it had considered all the evidence in the record, and ruled that "[e]ach instance of misconduct serves as an independent ground under which the PMAs have terminated."[18] In the trial court, Pinnacle recognized that other former Pinnacle employees at Fort Belvoir had testified to falsifying work order data, and Pinnacle

---

[16] See generally *Barone v. Law*, 242 Ga. App. 102 (527 SE2d 898) (2000); *Waldrup*, supra.

[17] *Marett v. Brice Bldg. Co.*, 268 Ga. App. 778, 779 (1) (603 SE2d 40) (2004) (citation omitted).

[18] (Emphasis omitted.)

13

pointed to no contradictions in their admissions. In its appeal brief, Pinnacle makes no effort to dispute those admissions. Consequently, Pinnacle failed to meet its burden as a respondent on summary judgment, and the trial court did not err by granting judgment as a matter of law in the Owners' favor on the issue of intentional misconduct by Pinnacle employees at Fort Belvoir.[19]

(ii) *Denise White*. White, a former Pinnacle employee at Fort Benning, testified that she changed thousands of work orders "from fails to passes," without knowing whether the work requested had in fact been completed within the timeframes set by the PMAs for their completion. White testified that after reviewing a "pass/fail report," she would "click on the item that showed as failed[,] . . . pull that work order up and change the dates, close it out again, and it would pass."

---

[19] See generally *Geary v. Wilshire Credit Corp*., 295 Ga. App. 620, 622 (4) (673 SE2d 15) (2009) ("When a prima facie showing is made that the moving party is entitled to judgment as a matter of law, the opposite party cannot rest upon the mere allegations in its pleadings, but must come forward with rebuttal evidence at that time or suffer a judgment against it.") (footnote omitted); *Petroziello v. United States Leasing Corp*., 176 Ga. App. 858, 861 (338 SE2d 63) (1985) ("The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact and if the trial court is presented with no choice from the facts except that offered by the movant, then the movant is entitled to summary judgment as a matter of law.") (citation omitted).

14

Pinnacle rebuts this evidence by pointing to White's testimony that she sometimes changed the *priority* of a work order if, for instance, a call "come through as an emergency but yet it was just a frame wall or a hole in the wall or a minor issue, . . . I would change [the priority of the work order] from emergency to . . . urgent or routine." But White's testimony that she changed the priority of a work order did not contradict her testimony that she changed an entry from "fail" to "pass." "To the contrary, it is, at best, a mere inconclusive inference . . . insufficient to get [Pinnacle] by [the Owners'] motion for summary judgment."[20]

Pinnacle further asserts that because the supervisor who White testified had instructed her to falsify data denied White's accusations, and because White purportedly "gave conflicting accounts of why she left Pinnacle, and may have harbored a grudge against [Pinnacle]," summary judgment was precluded. Pinnacle argues that evidence of the foregoing "raises a question of bias and also places [White's] credibility at issue." Pinnacle posits: "The material fact is therefore

---

[20] See *Hicks v. Heard*, 286 Ga. 864, 865 (692 SE2d 360) (2010) (mere fact that individual could have been called to duty at some point in the future, did not contradict individual's testimony that, at the time of the collision, she was not acting in the scope of her employment; "[t]o the contrary, it is, at best, a mere inconclusive inference . . . insufficient to get [the nonmovant, complainant] by [the movants'] motion for summary judgment.") (citation and punctuation omitted).

15

contradicted because the believability of her assertions that she 'intentionally' falsified data must be weighed against another's statement contradicting her and her own statements admitting animus against and bias toward Pinnacle. The decision of who to believe is left to the jury." Pinnacle relies upon *Harding v. Ga. Gen. Ins. Co.*[21] for the following proposition:

> Where, on a motion for summary judgment, it appears that the credibility of a witness or witnesses upon whose testimony the grant of the summary judgment depends is at issue in the case, neither the trial court nor this court will resolve the matter or is concerned with the credibility but will leave this matter to the jury, rather than grant summary judgment based on the "uncontradicted" area of the testimony of the witness, whose credibility is for the jury, and not for the trial judge or this court. . . . The success of an attempt to impeach a witness is always a jury question, as is the credibility of the witnesses where they contradict one another, or themselves.[22]

Pinnacle misconstrues *Harding*. Read in context, the foregoing principle applied and precluded summary judgment because conflicting or contradictory

---

[21] 224 Ga. App. 22 (479 SE2d 410) (1996).

[22] Id. at 25 (citation and punctuation omitted).

16

evidence went to a material issue in that case.[23] As addressed in Division 1 (a), whether White falsified data because a supervisor had instructed her to do so is immaterial. What is material, however, is White's testimony that *she* had falsified data; and her admission was not contradicted by any evidence.[24] Likewise, whether White's uncontradicted admission to falsifying data was worthy of belief (because she may have harbored ill feelings toward Pinnacle) is not a material fact which would preclude summary judgment.[25]

---

[23] Id. See *Cowart v. Widener*, 287 Ga. 622, 633 (3) (c) (697 SE2d 779) (2010) (the rule that "where material issues can be eliminated only by making credibility judgments, the movant has not met his burden," applies where "what one witness says on a material point is genuinely contradicted by some other evidence"); *Deen v. Stevens*, 287 Ga. 597, 612 (3) (b) (698 SE2d 321) (2010) ("[E]ven genuine issues of fact will not prevent the entry of summary judgment if the disputed facts are not 'material' to the legal issues in the case. . . . A plaintiff cannot avoid summary judgment by pointing to contradictory evidence in the record on an issue that makes no difference to the legal analysis."), citing *Anderson v. Liberty Lobby*, 477 U. S. 242, 247-248 (II) (A) (106 SCt 2505, 91 LE2d 202) (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

[24] See generally *Geary*, supra.

[25] See generally *Cowart*, supra; *Deen*, supra.

(iii) *Vonnie Bussey*. Bussey, a former Pinnacle employee at Fort Benning, testified that she changed work orders that "had failed on it" to "pass," by "chang[ing] the time and date," knowing that the information she was entering was inaccurate.

As with White, Pinnacle asserts that because the supervisor whom Bussey testified had instructed her to falsify data denied the accusations, and because issues as to Bussey's credibility allegedly existed, summary judgment was precluded. For the same reasons given in Division 1 (a) (ii), these assertions lack merit.

(b) Pinnacle asserts that division (C) of Paragraph 18.1 of the PMAs required the Owners to give notice of and an opportunity to cure any alleged default, and that the Owners failed to do so. We do not agree that 18.1 (C) contained a notice and cure provision.

Section 18 of each PMA is entitled "Termination," and is divided into seven paragraphs (18.1, 18.2, 18.3, 18.4, 18.5, 18.6, and 18.7). Paragraph 18.1 of the Fort Belvoir PMA pertinently reads as follows.

> 18.1 *TERMINATION FOR CAUSE:* Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease . . . upon the occurrence of any of the following events:
> A. *Breach of Agreement:* Ten (10) days (in connection with a monetary default) and/or thirty (30) days (in connection with a non-monetary

default) after the receipt of notice by any party to the others specifying in detail a material breach of this Agreement, if such breach has not been cured within said ten (10) day or thirty (30) day period, as applicable; or if, in the case of a non-monetary default, such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach has not commenced and/or such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured. However, the breach of any obligation of a party hereunder to pay any moneys to another party under the terms of this Agreement shall be deemed to be curable within ten (10) days.

B. *Excessive Damage:* Upon the destruction of or substantial damage to the Project by any cause, or the taking of all or a substantial portion of the Project by eminent domain, in either case making it impossible or impracticable to continue operation of the Project.

C. *Default:* Each of the following events shall constitute an event of default by the party in respect of which such event occurs:

1. the failure of a party to pay any amounts required to be paid by it hereunder or to perform any of its obligations hereunder for a period of ten (10) days after the date on which notice of the failure has been given to the defaulting party by the other parties;

2. the filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under bankruptcy or similar creditor relief law;

3. the consent to an involuntary petition in bankruptcy or the failure by such party to vacate, within sixty (60) days from the date of entry thereof, any order approving an involuntary petition;

4. the entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating such party as bankrupt or involvement or approving a petition seeking reorganization or appointing a receiver, trustee, conservator or liquidator of all or a substantial part of such party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days;

5. the failure to fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement and the continuance of any such default for a period of ten (10) days after written notice of said failure; and

6. theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents.

D. *Termination of Sublease.* By any party, upon written notice to the other, upon termination of the Sublease at any time, and further provided, if the Sublease terminates as to a portion of the Project only, then this Agreement may be terminated as to such portion only.

E. *Sale.* By any party, upon written notice to the others, upon the sale of all or substantially all of Owners' interest in the Project to a third party unaffiliated with Owners.

Paragraph 18.1 of the Fort Benning PMA is similar to Paragraph 18.1 of the Fort Belvoir PMA. That paragraph in either PMA identifies the occurrence of five categories of events that "shall terminate" the PMA and "all obligations of the parties [there]under shall cease"; either paragraph enumerates under the "Default" category,

20

"theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents" as occurrences that each constitute an event of default.

Pinnacle argues that the notice and cure provisions of division (A) are imputed to division (C), stating "[t]he events of 'default' in C are an extension of 18.1 (A), identifying additional types of default. Likewise, the language of C does not exclude notice and cure. The two clauses must be read together." The Owners disagree, stating "[t]he parties bargained that *some* of the[ ] terminating events contain notice and cure rights," but that the "most serious of the[ ] terminating events which occur under circumstances rendering Pinnacle unfit as a fiduciary manager – including bankruptcy, insolvency, fraud, theft and misconduct – contain *no* right to notice and cure."

> The cardinal rule of construction of contracts is to ascertain the intention of the parties. In determining such intention the courts must first look to the language of the instrument and, if that language be clear, the courts need look no further in ascertaining such intention. . . . There is no construction required or even permissible when the language employed by the parties in the contract is plain, unambiguous and capable of only one reasonable interpretation.[26]

---

[26] *Cowen v. Snellgrove*, 169 Ga. App. 271, 273 (2) (312 SE2 623) (1983) (citations and punctuation omitted).

Under neither PMA is a "default" synonymous with a "breach" of the contract terms. Under division (A) of Paragraph 18.1, a default is defined as "a material breach of this Agreement" and includes the additional elements of notice and timely attempts to cure.[27] In contrast, under division (C) of Paragraph 18.1, a default is defined as the occurrence of any one of several events, only some of which include the breach of an obligation or condition under the PMA, and/or the additional elements of notice and timely attempts to cure (1 and 5); an occurrence of default due to "theft, fraud, or other knowing or intentional misconduct," as set forth in division (C) includes neither a contractual breach nor a notice and cure provision. Notably, there is no mention in division (A) that the events of default referenced therein are "described below"[28] in division (C). The express, clear and unambiguous terms of each PMA reflect that

---

[27] See e.g., *Dude, Inc. v. Foamex, LP*, 269 Ga. App. 909, 910 (605 SE2d 459) (2004).

[28] *Legacy Academy v. JLK*, 330 Ga. App. 397, 401 (1) (765 SE2d 472) (2014). See e.g., *Walton v. Datry*, 185 Ga. App. 88, 93 (5) (a) (363 SE2d 295) (1987) (where a provision of a certain numbered paragraph of a contract referenced an article of the same contract).

where the parties intended that a terminating event include a notice and cure provision, the parties expressly provided so in the PMA.[29]

(c) Pinnacle claims that the Owners' termination of the PMAs was based on an allegation of fraud, rather than on a determination of fraud, which was a matter for a jury. Pinnacle further claims that to the extent that the trial court relied on "misconduct," as a basis to terminate the PMAs, that term was not defined in the PMAs, and thus, could not have served as a basis for the trial court's summary judgment determination.

The ground upon which the Owners moved for summary judgment, and upon which the trial court ruled, was "knowing or intentional misconduct," not fraud. The trial court made no finding in its order concerning fraud. Therefore, there is nothing for our review in that regard. Pinnacle's claim that the word misconduct was not defined in the PMAs and thus could not have served as a basis for the trial court's summary judgment determination also fails, inasmuch as Pinnacle did not raise that argument below, and cannot raise it for the first time on appeal.[30]

---

[29] See generally *Blueshift, Inc. v. Advanced Computing Technologies, Inc.*, 273 Ga. App. 802-805 (2) (616 SE2d 816) (2005).

[30] *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827-829 (1), (2) (573 SE2d 389) (2002).

(d) Pinnacle claims that the default provision was not automatically triggered in the event of fraud, arguing that the Owners "had discretion over whether to terminate the PMAs in the event of fraud; that is, they could elect the remedy or waive it."

Regarding whether the default provision was "automatically triggered" in this case, Section 18 of each PMA is entitled "Termination," and Pinnacle does not point to any other section that provides a method by which either PMA terminated. Paragraph 18.1 of each PMA states that "[n]otwithstanding" the provisions of the preceding paragraphs, "this Agreement shall terminate in any event and all obligations of the parties hereunder shall cease . . . upon the occurrence of" certain specified events including – pursuant to subparagraph (C) (6) of the Fort Belvoir PMA, and subparagraph (C) (4) of the Fort Benning PMA – a default due to "theft, fraud, or other knowing or intentional misconduct by [Pinnacle] or its employees or agents."[31] Accordingly, pursuant to the unambiguous terms of the pertinent PMA provision, the PMAs terminated upon the knowing or intentional misconduct of

---

[31] Compare *Etowah Valley Sporting Clay Park, LLC v. Dawson County*, 294 Ga. App. 586, 588-589 (1) (a) (669 SE2d 436) (2008) (paragraph of lease was ambiguous where heading and language therein potentially conflicted, and paragraph did not provide the sole method by which a party could terminate the lease, thereby making it plausible that paragraph was not intended to apply in all circumstances).

Pinnacle employees; there were no continuing obligations under the contract, and all obligations of the parties ended.[32]

Pinnacle argues that Section 23 of each PMA reserved what Pinnacle believed to be "every other remedy available in contract and at law," and that therefore, the Owners had discretion over whether to terminate the PMAs upon the occurrence of a default. Section 23 is entitled "Rights Cumulative: No Waiver," and the first sentence reads:

> No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement.

No right or remedy was *reserved* to the Owners in either 18.1 (C) (6) of the Fort Belvoir PMA or 18.1 (C) (4) of the Fort Benning PMA. Instead, those provisions mandated that the occurrence of specified events (theft, fraud, or other knowing or

---

[32] See *O'Donnell v. Durham*, 275 Ga. 860, 861 (3) (573 SE2d 23) (2002) ("'Shall' is generally construed as a word of mandatory import."); *Trustees of the Indep. Presbyterian Church v. Savannah Kidswear*, 215 Ga. App. 863 (1) (452 SE2d 546) (1994).

25

intentional misconduct by Pinnacle or its employees or agents) "shall terminate" each PMA. And Pinnacle does not point to any language in Section 23 that confers upon a party discretion whether to adhere to mandatory provisions of the PMAs.

Nothing in any of the cases relied upon by Pinnacle leads to a contrary conclusion. In *Holden v. Smith*,[33] because the defendants could elect one or more of several possible remedies under the contract once a default occurred, they were required to declare their intention, but failed to do so, rendering the grant of summary judgment in their favor error. In *Holden*, the default provision of an installment land sales contract pertinently provided, "Should the Buyer fail to make any payments as provided herein when due the amount paid hereon *may* be retained by the Seller as the consideration for making this agreement and thereupon the Seller shall be released from all obligation in law or equity to convey said property."[34] The buyer failed to make a payment, but made subsequent payments, and was prepared to tender the full amount due at closing; but the sellers refused to attend closing, claiming that a forfeiture had occurred with the missed payment.[35]

---

[33] 236 Ga. App. 205 (511 SE2d 569) (1999).

[34] Id. at 206 (emphasis in original).

[35] Id. at 206-207.

In *Holden*, this court determined that the remedy provision of the contract referred to "'the exercise of the right of forfeiture,' implying the vendor may choose not to exercise the right. It also provides that the sellers may pursue remedies other than forfeiture 'contemporaneously or otherwise,' implying the seller may choose another remedy in lieu of forfeiture."[36] The court concluded that the contract as a whole made clear that the word "may" in the default provision denoted permission, and that the person or persons who "may" declare forfeiture had the right to choose. The court held that because the sellers could elect one or more of several possible remedies including forfeiture once a default occurred, it became necessary for them to declare their intention, and that "[f]orfeiture was not an automatic result of default," and "[a]t a minimum the sellers were required to indicate whether they were exercising the contractual right to forfeiture."[37]

Nothing in *Eagle Glen Unit Owners Assn. v. Lee*,[38] upon which Pinnacle relies, requires a contrary result, either. In that case, this court affirmed the grant of summary judgment to the owners of property bought in foreclosure where the property owners

---

[36] Id. at 207.

[37] Id. at 207.

[38] 237 Ga. App. 240 (514 SE2d 40) (1999).

27

claimed that the foreclosure had not terminated an easement over adjacent land.[39] The court held that the terms of the instrument granting the easement, which terms controlled whether the easement could be terminated,[40] expressly provided for a "'perpetual easement' of indefinite duration and [did] not manifest any intention for the easement to be terminated."[41]

*Mendel v. Pinkard*[42] is also inapposite. In that case, a lease provision pertinently provided that "If the parties of the second part fail and refuse to comply with each and all of their covenants under this lease, then *at the election* of the parties of the first part, this lease shall become null and void."[43]

Unlike in this case, the controlling documents in the cases upon which Pinnacle relies conferred upon a party discretion to act.

(e) Pinnacle contends that an "implied covenant of good faith and fair dealing" applied to the Owners' termination of the PMAs, that it was for a jury to decide

---

[39] Id. at 240-241, 243 (1) (b).

[40] Id. at 242 (1) (b).

[41] Id. at 243 (1) (b).

[42] 108 Ga. App. 128 (132 SE2d 217) (1963).

[43] Id. (emphasis supplied).

whether the Owners had exercised their purported duties under said covenant "in good faith," and that there was "ample evidence [the Owners] did not act in good faith." Pinnacle argued before the trial court: "The duty of Good Faith and Fair Dealing requires that you examine the acts taken with discretion to determine whether they were arbitrary or egregious."[44]

But Pinnacle failed to raise a viable defense of breach of a duty of good faith and fair dealing where, as determined in Division 1 (d), the pertinent termination language of either PMA was mandatory, and not discretionary.[45]

---

[44] See *Ameris Bank v. Alliance Investment & Mgmt. Co.*, 321 Ga. App. 228, 234 (3) (a) (739 SE2d 481) (2013) ("[W]here the manner of performance of a contractual provision is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith.") (citation and punctuation omitted); *Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*, 281 Ga. App. 450-452, 454 (1), (2) (636 SE2d 139) (2006) ("relevant contract provision *authorizes* the Authority to declare default if Hunting conveys or assigns its interests in the adjacent real property or in the easement agreement without the prior written consent of the Authority. Thus, the agreement allows the Authority to exercise its discretion in determining whether to grant such consent"; implied duty of good faith and fair dealing "requires both parties to a contract to perform their promises and provide such cooperation as is required for the other party's performance. And, where the manner of performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith"; "The granting of discretion to a party triggers a duty to act in good faith") (citations and punctuation omitted; emphasis supplied and omitted).

[45] See generally *Ameris Bank*, supra; *O'Donnell*, supra. Compare *Hunting Aircraft, Inc.*, supra. But see *Martin v. Hamilton State Bank*, 314 Ga. App. 334, 336

29

(f) Pinnacle contends that the trial court erred by ignoring "limits [put] on [the Owners] imposed by the Operating Agreements of Clark Pinnacle Belvoir and Clark Pinnacle Benning."

The parties entering into the Operating Agreement of Clark Pinnacle Belvoir LLC were Clark Belvoir LLC and Pinnacle Belvoir LLC; the parties entering into the Operating Agreement of Clark Pinnacle Benning LL were Clark Benning LLC and Pinnacle Benning LLC.[46] Both operating agreements stated that the purpose of the formation of either company (Clark Pinnacle Belvoir LLC and Clark Pinnacle Benning LLC) was to be a managing member of FBRC and FBFC, which entities were "to-be-formed."

---

(723 SE2d 726) (2012) ("when a debt instrument explicitly confirms the right of the creditor to pursue one or more specified remedies for default, the creditor owes no duty to the debtor to pursue any particular remedy and may pursue whatever contractual remedy it chooses"; where the express terms of a note identified the remedies available to the bank in the event of a default, the bank was entitled to choose whichever remedy it preferred, i.e., although the bank was free to negotiate an agreement to restructure the debt that the appellant owed if it wished, it also was free to forego restructuring and instead declare default, accelerate the debt, and pursue collection of the debt in court, and bank's election did not constitute a breach of an implied covenant of good faith since bank did what the provisions of the contract expressly gave it the right to do).

[46] The parties that had entered into the PMAs were FBRC (by Clark Pinnacle Belvoir LLC), FBFC (by Clark Pinnacle Benning LLC), and AMSE.

30

Pinnacle argues that "Clark Realty, the Clark Manager of Clark Pinnacle Belvoir and Clark Pinnacle Benning" violated provisions of the operating agreements by failing to obtain the vote and consent of the Pinnacle Manager before removing Pinnacle and choosing a replacement, and consequently the Owners' "removal of Pinnacle as property manager violated the Operating Agreements of Clark Pinnacle Belvoir and Clark Pinnacle Benning, [and] is a wrongful termination." But Pinnacle did not assert this argument in the trial court.[47]

For instance, in its brief opposing the Owners' summary judgment motion, and in its supplemental response brief filed later, Pinnacle asserted that violation of the operating agreements showed that the Owners had failed to exercise good faith, which duty we determined in Division (1) (e)[48] did not apply with regard to the PMA termination provisions at issue in this case.[49] Pinnacle's new argument setting forth

---

[47] And Pinnacle's counterclaim alleged claims for wrongful termination for breaching the PMAs, not the operating agreements.

[48] Supra.

[49] At the hearing on the summary judgment motions, Pinnacle asserted an additional argument, that "Clark Realty Capital as the Managing Member of Clark Pinnacle Benning and Clark Pinnacle Belvoir" breached a fiduciary duty (owed to the members of Clark Pinnacle Benning and Clark Pinnacle Belvoir) which duty Pinnacle stated also "applie[d] to the discretionary provisions to terminate." As we determined in Division (1) (d), the pertinent terminating provisions are mandatory, not

31

alleged breach of the operating agreements as an independent ground for its wrongful termination claim (as opposed to support for its good faith argument) is not properly before this court.[50]

Each PMA states that it is the "entire agreement between Owners and Manager with respect to the management and operation of the Project." And Pinnacle failed to show that the Owners breached any obligations they owed to Pinnacle by allegedly violating provisions of operating agreements to which neither the Owners nor Pinnacle were parties.[51]

(g) Pinnacle contends that the PMAs' "insurance clause precludes automatic termination." We will not consider this argument, as Pinnacle did not assert it before the trial court.[52]

---

discretionary.

[50] See *Pfeiffer*, supra; *UWork.com v. Paragon Technologies, Inc.*, 321 Ga. App. 584, 591 (1) (a), n. 7 (740 SE2d 887) (2013) ("We will not consider new arguments in opposition to a motion for summary judgment raised for the first time on appeal.") (citation and punctuation omitted).

[51] See, e.g., *UWork.com*, supra at 592 (1) (b).

[52] See *Pfeiffer*, supra; *UWork.com*, supra at 591 (1) (a), n. 7.

2. Pinnacle contends that the trial court misconstrued Virginia law and erred by "failing to apply Virginia's economic loss rule to bar FBRC's tort claims" alleging breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and fraud.

"The 'economic loss rule' generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort."[53] The Supreme Court of Virginia has stated the rule and its exception as follows.

> As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained. However, a single act or occurrence can, in certain circumstances, support causes of action both for breach of contract and for breach of a duty arising in tort, thus permitting a plaintiff to recover both for the loss suffered as a result of the breach and traditional tort damages. . . . To avoid turning every breach of contract into a tort, however, we have consistently adhered to the rule that, in

---

[53] *General Electric Co. v. Lowe's Home Centers*, 279 Ga. 77, 78 (1) (608 SE2d 636) (2005) (punctuation and footnote omitted); see *Filak v. George*, 267 Va. 612, 618 (594 SE2d 610) (2004) ("losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contracts. The rationale for this rule lies in the distinctly different policy considerations distinguishing the law of torts from the law of contracts. The primary consideration underlying tort law is the protection of persons and property from injury, while the major consideration underlying contract law is the protection of bargained for expectations. Thus, when a plaintiff alleges and proves nothing more than disappointed economic expectations, the law of contracts, not the law of torts, provides the remedy for such economic losses.").

order to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract.[54]

Pinnacle claims that "FBRC . . . elicited no evidence of a breach of a common law duty that would exist independently of the contract," but that "[n]evertheless, the Trial Court found that there was a genuine issue of material fact as to whether Pinnacle owed a fiduciary duty independent of the contractual relationship." The Owners posited, "this is not a breach of contract case," i.e., that the claims alleging fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty arise from breaches of common law duties, and not breaches of contracts (the PMAs). Thus, the Owners assert, the trial court correctly ruled that the tort claims were not barred. Applying Virginia's economic loss rule to these claims, regarding the Fort Belvoir PMA, the trial court denied Pinnacle's summary judgment motion as to these claims.

(a) *Breach of fiduciary duty*. In their claim alleging breach of fiduciary duty, the Owners alleged that "under the Belvoir PMA, AMSE acted as an agent and

---

[54] *Dunn Constr. Co. v. Cloney*, 278 Va. 260, 266-267 (682 SE2d 943) (2009) (citations and punctuation omitted).

fiduciary of FBRC." The Owners asserted that "in its capacity as an agent and fiduciary of FBFC and of FBRC, AMSE was obligated to, among other things," do the following: manage the Projects by selecting vendors to perform repairs, maintenance, and other services; negotiate rates with vendors; pay vendors for work performed; ensure the various vendors were hired and paid in a commercially reasonable and economical and honest manner; accurately report data in connection with its response to resident work orders; and obtain insurance on behalf of and for the benefit of the Owners. The Owners claimed that "[i]n performing all of these duties, AMSE owed FBFC and FBRC the highest duty known to the law, could not engage in any self dealing, and was required at all times to put the interests of FBFC and FBRC above its own interests." The Owners argued before the trial court, "the Pinnacle defendants owe[d] common law fiduciary duties to [us]. They are our agent who controlled [our] money and who had authority to act on behalf of the agent and bind the agent under certain circumstances."

The Owners claimed, however, that AMSE breached its fiduciary duties to them in the following ways: causing the Owners to pay vendors above-market rates for products and services, to pay for vendors' double-billing, and to pay vendors for services that were not performed; failing to report to the Owners information known

35

to Pinnacle regarding allegations and facts of bribery, kickbacks, inflated rates, and double-billing between Pinnacle's employees and vendors; covering up conduct of bribery, kickbacks, inflated rates, and double-billing between Pinnacle's employees and vendors; reporting to the Owners false work order response times, which caused Pinnacle to be paid a higher incentive fee than it was entitled to receive; and causing the Owners to "pay fraudulently inflated insurance rates and related fees." The trial court applied Virginia law to FBRC's breach of fiduciary duty claim, and denied Pinnacle's motion as to that claim.

"A fiduciary relationship exists in all cases when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence."[55] "An agent is a fiduciary with respect to the matters within the scope of his agency."[56]

The alleged fiduciary duties the Owners claimed were breached related to certain provisions of the PMAs. For instance, Sections 8 and 9 of each PMA "authorized" AMSE to "hire, supervise, discharge and pay all personnel reasonably

---

[55] *Augusta Mutual Ins. Co. v. Mason*, 274 Va. 199, 207 (II) (645 SE2d 290) (2007) (citations and punctuation omitted).

[56] Id., citing *Horne v. Holley*, 167 Va. 234, 241 (188 SE 169) (1936) (punctuation omitted).

necessary to be employed in the management, maintenance and operation . . . from Owners' funds"; Section 9 "authorized" AMSE to "negotiate contracts for non-recurring items of expense," not to exceed a specified amount; Section 15 entitled AMSE to be paid an incentive fee calculated on the basis of work performance information AMSE reported; and pursuant to Section 12, AMSE "shall obtain and to keep in force" insurance coverage through a "Master Insurance Program."

Notwithstanding the fact that each PMA stated that it was the "entire agreement between Owners and Manager with respect to the management and operation of the Project," and that "[n]othing contained in this agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement," if any fiduciary relationship existed between the Owners and AMSE, the relationship was with respect to the aforestated matters, and but for the existence of the PMAs, AMSE would not have owed FBRC fiduciary duties. "Any fiduciary duty allegedly breached in this case existed solely because of the contractual relationship between [FBRC] and [AMSE]. . . . Therefore, we hold that [FBRC] failed

37

to assert a valid [tort] claim for breach of fiduciary duties."[57] The trial court's judgment is reversed as to this claim.

(b) *Aiding and abetting breach of fiduciary duty*. In Division 2 (a),[58] we determined that FBRC failed to assert against AMSE a valid tort claim for breach of fiduciary duties. Consequently, there can be no valid tort claim against AMS for aiding and abetting breach of fiduciary duties. The trial court's judgment is reversed as to this claim.

(c) *Fraud*. The allegations of fraud include, in part, the same misconduct alleged in the breach of fiduciary duty claim; and the Owners further alleged that Pinnacle "acted with scienter. By making affirmative misrepresentations of some facts, and by failing to disclose and/or concealing other facts which they had a duty to reveal, [Pinnacle] intended to induce . . . FBRC to continue its contractual relationship with AMSE under the Belvoir Property Management Agreement."

---

[57] *Augusta Mutual Ins. Co*., supra at 208 (II); see *Abi-Najm v. Concord Condo*., LLC, 280 Va. 350, 360 (II) (C) (699 SE2d 483) (2010) ("Losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contracts.") (citation and punctuation omitted).

[58] Supra.

A plaintiff asserting a cause of action for actual fraud bears the burden of proving by clear and convincing evidence the following elements: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.[59]

In *Richmond Metropolitan Auth. v. McDevitt Street Bovis, Inc.*,[60] in order to obtain progress payments for its work during its construction of a baseball stadium, a contractor submitted several documents to the municipal corporation, stating under oath that it had completed the construction work according to the design specifications set forth in the contract.[61] Many years later, the municipal corporation learned that the contractor had failed, despite its prior representations, to comply with certain design specifications; the municipal corporation filed an action against the contractor, alleging, inter alia, claims for actual and constructive fraud.[62] The Supreme Court of Virginia affirmed the trial court's grant of summary judgment for

---

[59] *Richmond Metropolitan Auth. v. McDevitt Street Bovis*, 256 Va. 553, 557-558 (II) (507 SE2d 344) (1998) (citations and punctuation omitted).

[60] Id.

[61] Id. at 555-556 (I).

[62] Id. at 556 (I).

the contractor.[63] The Supreme Court of Virginia held that because "each particular misrepresentation by [the contractor] related to a *duty or an obligation* that was specifically required by the . . . [c]ontract,"[64] the contractor's actions did not give rise to a cause of action for actual fraud.

In this case, Pinnacle has not connected the alleged misrepresentations to any duty or obligation specifically required by the Fort Belvoir PMA, except with regard to the allegations of a breach for causing the Owners to pay fraudulently inflated insurance rates and related fees. Because those allegations relate to Pinnacle's obligation under the PMA to obtain and to keep in force insurance coverage through a Master Insurance Program, the Owners failed to assert a valid tort claim for fraud in that regard.[65] Accordingly, the trial court's denial of Pinnacle's motion for

---

[63] Id. at 557 (II).

[64] Id. at 559 (II) (emphasis supplied).

[65] See *Dunn Constr. Co.*, supra at 268 (where under a contract, contractor had a duty to construct a foundation wall of a house "in a workmanlike manner according to standard practices," contractor's false representation that he had made adequate repairs related to a duty that arose under the contract; the fraud did not arise from the violation of a common law duty independent of the contract, and the judgment of the trial court confirming the award of punitive damages for fraud was reversed); *Augusta Mutual Ins. Co.*, supra at 201-203 (I), 206 (II) (in a third-party action for damages arising out of an insurance agents' allegedly fraudulent misrepresentations regarding the condition of a dwelling that the insurance company agreed to insure, the duties

summary judgment regarding the Owners' fraud claim involving the Fort Belvoir PMA is affirmed, except with regard to the allegations of a breach for causing the Owners to pay fraudulently inflated insurance rates and related fees.

3. Pinnacle contends that the trial court erred by denying its motion for summary judgment on the Owners' claim for breach of fiduciary duty regarding the Fort Benning PMA. We disagree.

The allegations of breach of fiduciary duty under the Fort Benning PMA are the same as the allegations of breach of fiduciary duty under the Fort Belvoir PMA. The trial court applied Georgia law to FBFC's breach of fiduciary duty claim regarding the Fort Benning PMA. Under Georgia law,

> A fiduciary duty exists where one party is so situated as to exercise a
> controlling influence over the will, conduct, and interest of another or

_____

that the agent allegedly violated by making fraudulent representations about the condition of an area of the house and by signing the homeowner's name, "arose solely by virtue of" a written agreement that "specifically required 'due diligence' in obtaining accurate information and making all necessary inspections required by [the insurance company]," and insurance company did not assert a valid claim for fraud in the inducement; *Richmond Metropolitan Auth*., supra at 559 (II) ("each particular misrepresentation by [the contractor] related to a duty or an obligation that was *specifically required* by the Design-Build Contract. [The contractor] contracted to inject grout into the conduits, to fill the grout tubes before cutting them off and sealing them, to submit accurate applications for payments, and to present an accurate certificate of substantial completion and 'as-built' drawings.") (emphasis supplied).

41

where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc. The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf. A special agency can arise when one person, expressly or by implication, authorizes another to do a single act on his or her behalf.[66]

Pinnacle asserts that, pursuant to Georgia's Brokerage Relationships in Real Estate Transactions Act (the "Act"),[67] AMSE owed no fiduciary duty to FBFC because AMSE was a property management company, "property managers are real estate brokers, and brokers do not have fiduciary obligations" under the Act. Relying on OCGA § 10-6A-4,[68] Pinnacle states that "[b]y statute, a broker's duties to a client are limited," and that "[n]o provision of the Benning PMA includes an express agreement by the parties establishing a fiduciary duty."

Pursuant to OCGA § 10-6A-3 (2) of the Act, "'Broker' means any individual or entity issued a broker's real estate license by the Georgia Real Estate Commission

---

[66] *UWork.com*, supra at 594-595 (4) (citations and punctuation omitted); see OCGA § 10-6-1.

[67] OCGA § 10-6A-1 et seq.

[68] OCGA § 10-6A-4 (a) (providing that "A broker shall not be deemed to have a fiduciary relationship with any party or fiduciary obligations to any party.").

pursuant to Chapter 40 of Title 43." Pinnacle has not pointed to any evidence showing that AMSE met this statutory definition in order to bring AMSE under the Act.

Next, Pinnacle concedes that "[t]he PMAs create[d] an expressly limited agency in AMSE," but asserts that "an agent is a fiduciary only with respect to the matters within the scope of his agency," and the Owners "have not alleged a breach of AMSE's limited fiduciary duty with respect to any of its four agency powers."[69] We disagree. The agency is not as limited as Pinnacle asserts. In addition to the "four agency powers" Pinnacle points out, the PMAs expressly granted AMSE authority to act on the Owners' behalf with regard to other matters as set forth in Division 2 (a),[70] where it is also shown that the Owners alleged that Pinnacle breached its fiduciary duty with respect to its authority set forth therein.[71]

---

[69] In its appeal brief, Pinnacle asserts that "the PMAs define [only four] circumstances . . . in which AMSE acts with some limited agency." Those circumstances include: obtaining legal advice, pursuant to Section 4.5 of each PMA; executing rental agreements on the Owners's behalf, pursuant to section 7.1; instituting and defending legal proceedings, pursuant to Section 7.4; and making certain contracts on the Owners's behalf, pursuant to section 9.3.

[70] Supra.

[71] See generally *Wright v. Apartment Investment & Mgmt. Co.*, 315 Ga. App. 587, 592-593 (2) (a) (726 SE2d 779) (2012). Compare *UWork.com*, supra at 585, 596

4. Pinnacle contends that the trial court erred in denying its motion for summary judgment on the Owners' claim that it aided and abetted a breach of fiduciary duty to the Owners.

(a) We need not address this contention with regard to the Fort Belvoir PMA, as we addressed that issue in Division (2) (b)[72] in accordance with Virginia law.

(b) Concerning the Fort Benning PMA, because AMSE was not a stranger to either the contract at issue or to the business relationship (between it and the Owners) giving rise to and underpinning the contract (the PMA), AMSE could not be liable for aiding and abetting a breach of any fiduciary duties.[73] Because AMS, as AMSE's

_____

(4) ("record was devoid of evidence" that one party was authorized to make representations on behalf of and to bind other party to a contract).

[72] Supra.

[73] See *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 608-610 (2), n. 1 (503 SE2d 278) (1998) ("in order to be liable for tortious interference, one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract"; determining applicability of the "stranger doctrine" to facts of the case); *Insight Technology v. FreightCheck, LLC*, 280 Ga. App. 19, 25-26 (1) (a) (633 SE2d 373) (2006) ("regardless of whether denominated 'aiding and abetting a breach of fiduciary duty,' 'procuring a breach of fiduciary duty,' or 'tortious interference with a fiduciary relationship,' Georgia law authorizes a plaintiff to recover upon proof of the following elements: (1) through improper action or wrongful conduct and *without privilege*, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely

parent company, was not a stranger to the business relationship (between AMSE and the Owners) giving rise to and underpinning the PMA, AMS could not be liable for aiding and abetting a breach of fiduciary duties owed to the Owners.[74]

*White v. Shamrock Bldg. Systems*,[75] upon which the Owners rely, is distinguishable. It is true, as the Owners assert, that Georgia law recognizes a claim for aiding and abetting a breach of fiduciary duty.[76] But in *White*, the claims alleged against the corporation were the same as those alleged against its sole shareholder – pertinently, breach of fiduciary duty; not aiding and abetting a breach of fiduciary duty.[77] Thus, the question of whether the corporation was, within the context of a claim for aiding and abetting a breach of fiduciary duty, a stranger to the business

---

[74] and with malice and the intent to injure; (3) the defendants' wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendants' tortious conduct proximately caused damage to the plaintiff.") (citations, punctuation and footnotes omitted; emphasis supplied); *White v. Shamrock Bldg. Systems*, 294 Ga. App. 340, 343, 345 (1), (3) (669 SE2d 168) (2008).

[74] See *Atlanta Market Center Mgmt. Co.*, supra at 610 ("[P]arties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships.") (citation omitted).

[75] Supra.

[76] See *Insight Technology*, supra.

[77] *White*, supra at 347 (5).

relationship giving rise to and underpinning the contract allegedly breached, was not addressed.[78] Likewise, this court's decision in *Wright v. Apartment Investment & Mgmt. Co.*,[79] upon which the Owners also rely, did not address whether the stranger doctrine applied.[80]

Accordingly, we reverse the trial court's order to the extent that it denied summary judgment on this claim regarding the Fort Benning PMA.[81]

5. Pinnacle contends that the trial court erred by denying Pinnacle's motion for summary judgment as to FBRC's claims against Pinnacle under Georgia's RICO[82]

---

[78] Id. at 347-349 (5).

[79] Supra.

[80] *Wright*, supra at 596-597 (3) (b). See *Holton v. Physician Oncology Svcs.*, 292 Ga. 864, 869-870 (2) (742 SE2d 702) (2013) ("We have repeatedly cautioned that our decisions stand only for the points raised by the parties and decided by the court. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (citations and punctuation omitted); *Sembler Atlanta Dev. I, LLC v. URS/Dames & Moore*, 268 Ga. App. 7, 10 (601 SE2d 397) (2004) (issue raised by the present appeal was not addressed in cases cited by appellee; "questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (citations and punctuation omitted).

[81] See *Atlanta Market Center Mgmt. Co.*, supra.

[82] See generally OCGA § 16-14-1, Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act.

statute. In a footnote of its order denying Pinnacle's motion for summary judgment regarding the RICO claim, the trial court wrote, "Because Virginia has no civil RICO statute, the Court will apply Georgia law to its analysis."

Under the rule of lex loci delicti, tort cases are governed by the substantive law of the place where the tort or wrong occurred, and in torts of a transitory nature the place of the wrong is the place where the last event occurred necessary to make an actor liable for the alleged tort.[83] . . . However, Georgia recognizes a public policy exception to the rule of lex loci delicti. . . . Under the public policy exception to the rule of lex loci delicti, Georgia will not apply the substantive law of the place where the tort was committed if application of the foreign law contravenes our established public policy, or the recognized standards of civilization and good morals; and this exception on account of the contravention of public policy of the State is sometimes invoked where the foreign statute is designed to redress an injury, but prescribes a form of redress which is radically dissimilar to anything existing in our own system of jurisprudence. The substantive law of the place where the tort was committed and where the action arose will be applied by Georgia courts even where Georgia law recognizes a cause of action not available in the foreign jurisdiction, provided the enforcement of the lex

---

[83] Compare *Fed. Ins. Co. v. Nat. Distrib. Co.*, 203 Ga. App. 763, 765 (417 SE2d 671) (1992) ("Under the rule of lex loci contractus, the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made, except that where the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is performed will apply.") (citation omitted).

delicti would not seriously contravene the established policy of the forum.[84]

Pinnacle contends that "Georgia's RICO statute does not reach the alleged conduct at Fort Belvoir." Pinnacle asserts that the choice of law for the RICO claim, which "sounds in tort," is determined by the rule of lex loci delicti, which, with regard to the RICO claim asserted by FBRC against Pinnacle, would be Virginia, as "FBRC sustained any injury in Virginia and certainly not in Georgia."

The Owners respond that the public policy exception to the rule of lex loci delicti applies. They argue that "Virginia has no civil remedy for racketeering," and that this "radically dissimilar" difference in the form of redress in Virginia law compared to Georgia law contravenes Georgia's established public policy to condemn racketeering and to "provide any civil claim for a private plaintiff harmed by racketeering." The Owners assert that "[t]o allow similar fraudulent misconduct – by

---

[84] *Alexander v. GMC*, 219 Ga. App. 660, 660-661 (466 SE2d 607) (1995) (citations and punctuation omitted), reversed as stated in *Alexander v. GMC*, 267 Ga. 339, 340 (478 SE2d 123) (1996) (though reversing, the Supreme Court iterated that "The opinion by the Court of Appeals correctly states the choice of law principles applicable to this case, including the public policy exception to the rule of lex loci delicti.").

the same companies and set of executives – to receive disparate legal treatment, makes no legal sense and runs contrary to Georgia policy."

But Pinnacle argues that it would be improper to permit FBRC to assert against Pinnacle a claim under the Georgia RICO statute when FBRC has no connection with Georgia, and Pinnacle has no connection to Georgia as it concerns FBRC's RICO allegations regarding the Fort Belvoir PMA. The appellate record supports Pinnacle's assertions that FBRC is a Delaware limited liability company with an office in Maryland; Clark Pinnacle Belvoir LLC (FBRC's managing member) is a Virginia limited liability company; Fort Belvoir is located in Virginia; AMSE is a Washington limited liability company; the Belvoir PMA states that its execution, interpretation and performance shall in all respects be controlled and governed by the laws of the state of the location of the project, which is Virginia; there is no evidence that FBRC was a victim of a crime or tort in Georgia; and there is no evidence that any criminal or tortious conduct by Pinnacle employees in Georgia resulted in injury to FBRC outside of Georgia.

The law that all claims alleged must bear a significant relationship to the forum state for the law of the forum state to apply is clear.

[W]hile a State may . . . assume jurisdiction over the claims of plaintiffs whose principal contacts are with other States, it may not use this assumption of jurisdiction as an added weight in the scale when considering the permissible constitutional limits on choice of substantive law. It may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a "common question of law." The issue of personal jurisdiction over plaintiffs . . . is entirely distinct from the question of the constitutional limitations on choice of law; the latter calculus is not altered by the fact that it may be more difficult or more burdensome to comply with the constitutional limitations. . . . [the forum state] must have a "significant contact or significant aggregation of contacts" to the claims asserted by each . . . plaintiff . . . , contacts "creating state interests," in order to ensure that the choice of [the forum state's] law is not arbitrary or unfair.[85]

None of the cases relied upon by the Owners involved the constitutional limitations on choice of law set forth above; and in any event, in each of those cases,

---

[85] *Phillips Petroleum Co. v. Shutts*, 472 U. S. 797, 821-822 (III) (105 SCt 2965, 86 LE2d 628) (1985) (punctuation omitted); *Allstate Ins. Co. v Hague*, 449 U. S. 302, 310-313 (II) (101 SCt 633, 66 LE2d 521) (1981) ("if a State has only insignificant contact with the parties and the occurrence or transaction, application of its law is unconstitutional"; "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair") (footnote omitted); *EarthLink, Inc. v. Eaves*, 293 Ga. App. 75, 79-80 (5) (666 SE2d 420) (2008).

50

unlike here, it was clear that Georgia had significant contacts to the claims asserted, thus supporting the state's interest in applying Georgia law.[86]

We cannot determine from the order whether the trial court, in its conclusion that the Georgia RICO statute applied because Virginia did not have a civil RICO statute, considered whether Georgia had a significant contact to FBRC's RICO claim such that the choice of Georgia law was not arbitrary or unfair.[87] Therefore, we

---

[86] See *Smith v. Graham Constr. Co*., 327 Ga. App. 823, n. 1 (761 SE2d 370) (2014) (in suit for work-related injury on a construction project, employee was a Georgia resident, employer was a Georgia limited liability company, and general contractor was registered to do business in Georgia); *Bailey v. Cottrell, Inc*., 313 Ga. App. 371 (721 SE2d 571) (2011) (plaintiff/employee injured in Indiana in fall from tractor-trailer manufactured by Georgia corporation); *Carroll Fulmer Logistics Corp. v. Hines*, 309 Ga. App. 695-696 (710 SE2d 888) (2011) (Georgia rather than Florida substantive law applied to the wrongful death and survival actions, where fatal collision occurred in Florida, but both drivers of tractor trailers that collided were Georgia residents); *Alexander*, supra, 219 Ga. App. at 660-661 (driver sued for injuries he sustained due to allegedly defective vehicle he purchased in Georgia); *Karimi v. Crowley*, 172 Ga. App. 761 (324 SE2d 583) (1984) (employee, a Georgia resident, was injured in the course of his employment on a construction project in Alabama; co-employee/supervisor was also a Georgia resident; general contractor on Alabama project was a Georgia corporation; and subcontractor (immediate employer) on project was a Georgia corporation). The Owners' reliance on *Hyperdynamics Corp. v. Southridge Capital Mgmt*., 305 Ga. App. 283 (699 SE2d 456) (2010), is misplaced, as that opinion is physical precedent only, being that one member of the three-judge panel concurred in the judgment only. See Court of Appeals Rule 33 (a).

[87] See *Nasco, Inc. v. Gimbert*, 239 Ga. 675-676 (2) (238 SE2d 368) (1977) (first ascertaining whether there were significant contacts with the state of Georgia, such that the choice of our law was neither arbitrary nor constitutionally impermissible,

reverse and remand the case for consideration of this claim under the standard set forth in *Shutts* and *Allstate, Ins. Co*.

6. Pinnacle contends that the trial court erred by denying its motion for summary judgment as to the Owners' unjust enrichment claim.

The Owners assert that the PMAs "do not govern the frauds and schemes executed by Pinnacle"; the Owners' claim for unjust enrichment is predicated on evidence they assert showed that Pinnacle "tricked the Owners into paying them millions of dollars through years of extra-contractual fraud and lies[,] . . . [including] secret fees, fraudulently inflated compensation, and kickbacks from vendors in exchange for passing fraudulently inflated costs on to the Owners." In denying Pinnacle's summary judgment motion as to this claim, the trial court ruled that "[b]ecause unjust enrichment . . . [is] [a] common-law claim[ ], Georgia choice-of-law rules require application of Georgia law to [the Owners'] unjust enrichment . . . claim[ ]." The trial court further ruled that, viewing the facts in the light most favorable to the non-moving party (the Owners) on summary judgment, genuine issues of material facts exist and the claim should be presented to a jury.

---

before engaging in choice of law analysis).

Pinnacle does not dispute the trial court's application of Georgia law to this claim, particularly regarding the Fort Belvoir PMA. Rather, Pinnacle contends that the Owners' claim for unjust enrichment fails as a matter of law because of the existence of express contracts, and because the Owners admittedly did not challenge the validity of either PMA.

> Unjust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for. A claim for unjust enrichment is not a tort, but an alternative theory of recovery if a contract claim fails.[88]

Because there was no contract between the Owners and AMS (which entity was not a party to either PMA), the trial court's denial of summary judgment regarding the Owners' claim against AMS for unjust enrichment is affirmed.[89] However, because

---

[88] *Wachovia Ins. Svcs. v. Fallon*, 299 Ga. App. 440, 449 (6) (682 SE2d 657) (2009) (citations and punctuation omitted).

[89] *Morrell v. Wellstar Health System, Inc.*, 280 Ga. App. 1, 6-7 (4) (633 SE2d 68) (2006) ("Unjust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract."), citing *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136-137 (1) (508 SE2d 646) (1998) (unjust enrichment claim asserted against husband whose wife pled guilty to embezzling funds from employer, contending that substantial amount of embezzled funds inured to husband's benefit).

the Owners asserted unjust enrichment against AMSE as a separate tort and not as an alternative theory of recovery for a failed contract, that claim against AMSE fails as a matter of law.[90] The trial court's denial of summary judgment regarding the Owners' claim against AMSE for unjust enrichment is therefore reversed.

*Judgment affirmed in part and reversed in part, and case remanded with direction. Doyle, C. J., concurs. Boggs, J., concurs in judgment only*.

---

[90] See *Wachovia Ins. Svcs.*, supra (citations and punctuation omitted).